Calvin Eugene **LAMBERT**

v.

**UNITED STATES of America.**

Civ. A. No. C75–26A.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 17, 1975.

Calvin Eugene Lambert, pro se.

John W. Stokes, Jr., U. S. Atty., Sherman D. Johnson, Asst. U. S. Atty., Atlanta, Ga., for respondent.

## ORDER

EDENFIELD, Chief Judge.

A guilty plea constitutes a waiver of several constitutional rights to which an accused is entitled, and courts indulge every reasonable presumption against the validity of such waivers, demanding that they be made voluntarily and intelligently. It is apparently with this well-settled rule in mind that petitioner, a prisoner incarcerated in the Atlanta federal penitentiary, filed this motion to vacate his sentence, pursuant to 28 U.S.C. § 2255. The motion asserts that petitioner's guilty plea is constitutionally invalid because petitioner was allegedly misled as to the effect of his negotiated plea. More specifically, petitioner alleges that he relied on his attorney's erroneous prediction of when the parole board would decide to release him from confinement under his indeterminate sentence, and that such reliance vitiated the voluntary and intelligent character of his guilty plea. This court must disagree.

The petitioner in this case was sentenced by this court to serve three concurrent fifteen-year sentences under 18 U.S.C. § 4208(a)(2) for three separate

bank robberies. This sentence was jointly recommended to the court by the United States attorney and defendant's retained counsel pursuant to plea negotiations, and it was accepted, subject to pre-sentence investigation.

At the Rule 11, F.R.Crim.P., hearing on January 15, 1975, petitioner stated that he was aware that plea discussions were going on between his counsel, the United States attorney, and the court, that he approved of those negotiations at the time, and that he still approved of them. He stated further that he understood the maximum sentence imposable for his offenses, and that his plea was entered "freely and voluntarily, without anybody threatening [him] or promising [him] anything." Tr. 5.

At sentencing on March 1, 1975, the following colloquy took place:

"THE COURT: All right, sir. You know your attorney and the United States Attorney have talked to the Court about your case?

"MR. LAMBERT: Yes, sir.

"THE COURT: And have agreed to make a joint recommendation to the Court that I give you concurrent sentences on all of these charges of fifteen years to run concurrently, as an indeterminate sentence under—so *that you can be paroled at any time the Parole Board sees fit?*

"Were you aware of those negotiations?

"MR. LAMBERT: Yes, sir, I have been.

"THE COURT: Did you approve of them at that time?

"MR. LAMBERT: Yes, sir.

"THE COURT: And do you approve of them now?

"MR. LAMBERT: Yes, sir, I do." (Tr. 9, 10, emphasis added.)

Less than nine months later, petitioner sought leave to file in forma pauperis this motion pursuant to 28 U.S.C. § 2255, which motion was ordered filed on January 3, 1975. Four of petitioner's five alleged grounds for his motion to vacate sentence were found to be without merit in this court's order of March 14, 1975, and the court heard evidence and argument pertaining to the remaining ground of the motion at a hearing held on April 11, 1975.

The gravamen of the surviving complaint is that petitioner entered his guilty plea as the result of a "false promise" allegedly made by the United States attorney, through petitioner's retained counsel, that petitioner would be released in twelve to eighteen months if he took a fifteen-year type-A sentence. 18 U.S.C. § 4208(a)(2). The government denies ever making such a promise either to petitioner or to his attorney. The evidence shows that Assistant United States Attorney Gale McKenzie discussed with defense counsel the strength of the government's case against petitioner, as well as various sentence recommendations, including three concurrent ten-year sentences, but that final agreement was reached upon the fifteen-year type-A sentence. Defense counsel apparently indicated to Ms. McKenzie that he knew little of federal sentencing and parole procedures, and that he was relying upon her expertise in such matters to understand the effect of the various types of sentences. Ms. McKenzie testified that she explained that under a type-A sentence a prisoner can be paroled at any time in the discretion of the parole board. She further explained that, while a type-A sentence means that a defendant is immediately eligible for parole, as a practical matter a parole hearing may not even be scheduled until twelve to eighteen months after the defendant has been assigned to an institution. Defense counsel testified, however, that Ms. McKenzie concurred in his conclusion that petitioner would be released within eighteen months under such a sentence, and that an unidentified "parole officer" at the Atlanta federal penitentiary likewise concurred with that prediction.

After conferring with Ms. McKenzie, defense counsel advised his client of the recommendation tentatively agreed upon,

explaining that by taking the fifteen-year type-A sentence, instead of the ten-year straight sentence, it was "the very strongest probability" that he would be released within twelve to eighteen months. He stated to petitioner that this was not a guarantee, but testified further that in his own mind he considered such a result to be "as certain as the sun rising tomorrow morning." Relying on this advice, as compared with the knowledge that it would be at least forty months before he would be eligible for parole under a ten-year straight sentence, petitioner agreed to accept the bargain and plead guilty. Petitioner himself testified that his counsel told him, and that he fully understood, that there was "the remotest possibility" that he would have to serve the entire fifteen years in an institution. Nevertheless, he chose to take the longer type-A sentence rather than the shorter straight sentence in order to secure earlier eligibility for parole.

Within four months of sentencing, petitioner was afforded a parole hearing, but parole was denied and petitioner is next scheduled for an institutional review hearing in June 1977. It was apparently this three-year setoff which triggered petitioner's § 2255 motion, since he now is scheduled to remain in confinement for at least two to three times as long as he expected when he entered his plea. Petitioner now claims that, had he known that such would be the result of his type-A sentence, he would have opted for the shorter ten-year sentence, under which he would still have been eligible for parole in approximately June 1977, but also under which he would be subject to one-third less time under supervision. It is this misunderstanding which petitioner claims robs his guilty plea of its voluntariness.

■ Ordinarily, the mere erroneous prediction of sentence by counsel does not make a guilty plea involuntary. *See* Tindall v. United States, 469 F.2d 92 (5th Cir. 1972); Wellnitz v. Page, 420 F.2d 935 (10th Cir. 1970); Moore v. United States, 334 F.2d 25 (5th Cir. 1964); Georges v. United States, 262 F.2d 426, 430 (5th Cir. 1959); *contra* Kelsey v. United States, 484 F.2d 1198 (3d Cir. 1973). This is especially so when counsel is retained by the defendant himself (as was the case here) rather than appointed by the court. *See* Fitzgerald v. Estelle, 505 F.2d 1334 (5th Cir. 1974); United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967). Advice given by counsel need not be perfect; it need only be reasonably competent within the standards set forth in McMann v. Richardson, 397 U. S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Herring v. Estelle, 491 F.2d 125, 128 (5th Cir. 1974). In *McMann* the Supreme Court noted that the requirement that "a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a postconviction hearing." 397 U.S. at 770, 90 S.Ct. at 1448. Whether erroneous advice of counsel is sufficient to negate the intelligent or voluntary character of a guilty plea depends not on whether a court would retrospectively consider such advice to be right or wrong, but rather on "whether that advice was within the range of competence demanded of attorneys in criminal cases." At 771, 90 S.Ct. at 1449.

Defendants facing criminal charges are entitled to the effective assistance of competent counsel; but if it is recognized, as *McMann* did, that "uncertainty is inherent in predicting court decisions," *id.*, it must be recognized that uncertainty is inherent *a fortiori* in attempting to predict decisions of the United States Board of Parole. Recognition of this latter element of uncertainty leads this court to distinguish this case from the recent case of Hill v. Ternullo, 510 F.2d 844 (2d Cir. 1975). Relying on Leeson v. Damon, 496 F.2d 718 (2d Cir. 1974), cert. denied, 419 U. S. 954, 95 S.Ct. 216, 42 L.Ed.2d 172 (1974), the Second Circuit held that counsel's failure to advise his client

properly on the maximum or minimum term fixed by statute for an offense may vitiate the guilty plea. The opinion focused on the fact that the defendant's plea was made with reliance on erroneous legal advice about "the ultimately knowable: the length of time which, under the applicable statutes, he might be kept in prison." The Second Circuit was at pains to note that counsel in that case was "not being second-guessed about a prediction which has proven inaccurate but, rather for a misstatement of easily accessible fact." 510 F.2d at 847.

 In the case at bar, on the other hand, defense counsel's advice con-

cerned facts which were not "ultimately knowable" at that time.[1] Counsel's advice concerned, rather, an area of decided uncertainty; given the number and complexity of factors apparently taken into account by the parole board in making a parole decision, counsel can, at best, make nothing more than an educated guess as to how and when the board will decide an individual case. For an attorney to purport to advise his client, in terms of "the very strongest probability", of the length of time which the parole board will choose to keep him in prison is certainly an exercise of bad judgment, but it is not a misstatement of "easily accessible fact." [2]

1. Subsequent to the events in issue in this case, on June 5, 1974, the Justice Department's new regulations concerning parole release, 28 C.F.R. Part 2, were published. A new section 2.20 was promulgated establishing nationwide paroling policy guidelines. Had these guidelines been public knowledge when petitioner was considering the desirability of various sentences in light of parole eligibility, his counsel might well have consulted these guidelines in order to estimate the average total time which the parole board generally feels should be served by a prisoner like petitioner; had he done so, he could easily have calculated both petitioner's salient factor score and the severity factor of his offenses to estimate petitioner's likely period of incarceration.

However, these guidelines were not public knowledge either at the time of petitioner's arraignment or at the time of his sentencing. Therefore, unlike the subject of the misinformation in Hill v. Ternullo, *supra*, the parole board's suggested average period of confinement for a prisoner like petitioner was not "ultimately knowable."

2. As this court has stated on numerous occasions, it is at least as reluctant to try to divine in advance anything the parole board might do as it is reluctant to interfere with the parole board's largely unreviewable discretion. This court has repeatedly advised defendants who request that they be given a type–A sentence that they may not be getting the "good deal" they believe they are. Prisoners who are optimistic enough to equate "immediate parole eligibility" with entitlement to near-immediate release, and who consequently request a parole hearing at the earliest possible time (before they have had sufficient time to establish a good institutional record or any indication of rehabilitation) are apt to be rudely surprised

when they are set off for years before obtaining another hearing. This is apparently what happened to petitioner, and it seems likely that the resulting feeling of being cheated was the motivating force behind this motion to vacate sentence.

The rationale behind the indeterminate sentence authorized by 18 U.S.C. § 4208(a)(2) is ill-served by paroling procedures which set a prisoner off for years at a time between review hearings. This court employs the indeterminate sentence as an alternative to the relative inflexibility of 18 U.S.C. § 4202, which provides that a prisoner is not eligible for parole consideration until he has served one-third of the sentence imposed. This court believes that, in selected cases, § 4202 is not sufficiently responsive to the rehabilitation potential which this court may perceive in certain defendants at the time they are sentenced. That statute "does not take into consideration the response made by an individual prisoner to the rehabilitation programs carried on in our Federal institutions. Much bitterness is engendered in many prisoners who have otherwise admirably responded to rehabilitation programs by the knowledge that they must be incarcerated for a purely arbitrary period [under § 4202]." 1958 *U.S.Cong. & Admin.News*, pp. 3904–05. Since this court loses jurisdiction of the defendant it has sentenced after 120 days, Fed.R.Crim.P. 35, it has no power to follow up on him later to determine if the ends of justice and of effective rehabilitation would be as well or better served by keeping him under parole supervision, rather than in custody, for the remainder of the term. Section 4208(a)(2) was designed to help ameliorate that situation by instituting a degree of cooperation between the judiciary and the executive branch—by permitting the court to share responsibility for determining how long a period a prisoner should

Counsel does his client a great disservice by confidently predicting a parole release date (whether relying on the alleged expertise of the United States Attorney's office or even with the aid of the current guidelines) without liberally dosing his client with caveats.

The court is, however, unable to conclude that the disservice done in this case was outside the "range of competence demanded of attorneys in criminal cases." McMann v. Richardson, *supra*, 397 U.S. at 771, 90 S.Ct. at 1449. It was not a misstatement of the "ultimately knowable"; it was simply a bad judgment call. Petitioner is an intelligent and articulate man (as was evident from his able handling of his own case at the oral hearing); he was aware that he could be paroled at *any* time the parole board· saw fit, and he was also aware that there were no guarantees and that he might serve the entire fifteen-year term in prison. The court is not persuaded that his reliance on the retrospectively-erroneous representations of his retained counsel is sufficient to vitiate the intelligence or voluntariness of his guilty plea. This conclusion is lent further weight by the fact that it would be manifestly unreasonable for anyone to expect that a man who has committed three separate bank robberies would be back on the street in twelve to eighteen months. Petitioner, with or without justification, may well have been disappointed at having been set off for three years before his next parole hearing, but, having determined that pe-

titioner's attack on the validity of his guilty plea is without constitutional merit, this court is without further power to afford petitioner any relief.

Accordingly, petitioner's motion to vacate his sentence is denied and the action dismissed.

---

actually serve. Ideally, the court, by its use of the (a)(2) sentence, indicates to the parole board its view that this prisoner *may* be suitable for supervised release before the normal one-third point in his sentence. This in no way commits the board to release such a prisoner prior to the one-third point. Indeed, it does not even commit the board to release him before his mandatory release date. It should, however, commit the board to engage in closer and more frequent scrutiny of such a prisoner's institutional record and rehabilitation potential.

Congress did not intend § 4208(a)(2) to "embody a softening in criminal penalties." 1958 U.S.Cong. & Admin.News, p. 3893. "Law

and order" is not at issue here. What is at issue is the entire adequacy of the vastly-overworked bureaucracy known as the United States Board of Parole to cope fairly and effectively with the inmate population of the country's federal prisons, and its ability to do so consonant with the demands of justice, enlightened penology, the public's best interest, and the Constitution. The resolution of that issue is the responsibility of the Congress, but it is the responsibility of the courts to keep that issue in mind when considering § 4208(a)(2) among other sentencing alternatives available in an individual case.